UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICKAEL WAMEN, et al., | CASE NO.  5:13CV1084 |
| PLAINTIFFS, | JUDGE SARA LIOI |
| vs. | |
| | OPINION AND ORDER |
| THE GOODYEAR TIRE & RUBBER COMPANY, | |
| DEFENDANT. | |

In this class action, plaintiffs, Mickael Wamen ("Wamen") and Comite d'Etablissement d'Amiens Nord ("Works Council"), seek damages under a bonus agreement entered into between the Works Council and Goodyear Dunlop Tire France SA ("Goodyear France"), a subsidiary of defendant, the Goodyear Tire & Rubber Company ("Goodyear"). Defendant has moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted. (Doc. No. 9, Renewed Motion to Dismiss.) Plaintiffs oppose the motion (Doc. No. 10), and defendant has filed a reply. (Doc. No. 12.)

 **I.** **BACKGROUND**

All of the facts are taken and accepted as true as they appear in the amended complaint. Goodyear France owns and operates a tire manufacturing plant in the city of Amiens North in the north of France ("Amiens North Factory"). Tire production at the Amiens North Factory is split between consumer tires and farm tires.

(Doc. No. 6, Am. Compl., at ¶ 33.) The plant employs more than one-thousand employees, and the putative class is comprised of all current and former employees working at the Amiens North Factory on or after January 1, 2009. (*Id*. at ¶¶ 19, 32.) The Works Council is the French labor organization that represents the workers at the Amiens North Factory, including plaintiff and the putative class. (*Id*. at ¶ 14(a).) Goodyear owns 75% of Goodyear France, and all tires manufactured at the Amiens North Factory bear the Goodyear label. (*Id.* at ¶¶ 6, 33.)

In 1995, Goodyear France and the Works Council entered into an agreement styled "Memorandum of Agreement Between the Management and Unions" ("bonus agreement") that remains in effect today. (Doc. No. 6-4, French Original Document and Translated Copy.) Pursuant to the bonus agreement, employees of the Amiens North Factory are entitled to a quarterly bonus. The amount of the bonus payment is based entirely upon the number of tons of tires produced at the plant. (*Id*.) It is undisputed that Goodyear is not a party to this agreement.

In a press release, dated May 26, 2009, Goodyear announced a plan that would discontinue consumer tire production at the Amiens North Factory. The release further indicated that Goodyear was considering the divestiture of its farm tire business in Amiens North. That same day (May 26, 2009), Goodyear France announced at a meeting of the Works Council that Goodyear was contemplating the discontinuation of consumer tire production in Amiens North, and was further considering the sale of its farm tire division. (*Id*. at ¶¶ 34-36.) According to the amended complaint, plaintiffs believe that Goodyear always intended to discontinue *all* tire production in Amiens North as part of a

2

concealed plan "to eliminate the jobs of French workers and to shift manufacturing to countries whose workers received lower pay and much less job protection." (*Id*. at ¶ 37.)

On September 23, 2009, Goodyear forwarded to the Works Council a letter of intent from Titan Tire Corporation ("Titan"), in which Titan expressed its interest in acquiring the farm tire business at the Amiens North Factory. (*Id*. at ¶ 38.) Plaintiffs allege that they were led to believe that a necessary condition precedent to Titan's purchase of the farm tire portion of the Amiens North Factory business was the elimination of the jobs of its employees in the consumer tire unit. (*See id*. at 40.) In fact, on December 13, 2010, Goodyear and Titan entered into a put option agreement whereby Goodyear France was required to eliminate the consumer tire jobs at its facility. (*Id*. at ¶ 40.) Believing that Titan intended to purchase the plant and continue some operations there, the Works Counsel—on behalf of the factory workers—entered into negotiations for the severance of the consumer tire unit employees. (*Id*. at ¶ 42.)

Behind the scenes, Goodyear purportedly began to instruct Goodyear France to drastically reduce the number of tires it produced in Amiens North. Goodyear repeatedly denied that it was simply shifting tire production to other facilities in Europe, and insisted that the production decreases were temporary, designed solely to facilitate the sale of the Amiens North Factory to Titan. In 2009 alone, plaintiffs allege that the reduction amounted to approximately 2,000,000 tires. (*Id*. at ¶ 44.) In all, between 2009 and the filing of the amended complaint, plaintiffs allege that production fell by 2,800,000 tires. (*Id*. at ¶ 60.)

Plaintiffs believe that the announced sale to Titan was a ruse. While tire production in Amiens North was steadily decreasing, plaintiffs allege that the number of

3

consumer tires produced by Goodyear's subsidiaries in other parts of Europe "increased significantly." (*Id*. at ¶ 60.) Plaintiffs also point to Titan's abrupt cessation of negotiations with the Works Council in February 2013 as further evidence that Titan "never had real intentions to maintain operations in the Amiens North Factory." (*Id*. at 42.)

The Works Council sought to enjoin the restructuring activity by filing an action in the French courts. On August 28, 2009, the President of the Civil Court of Naterre found that Goodyear France violated its duties under the French Labor Code to disclose and consult with employee representatives before engaging in any restructuring activity at the Amiens North Factory. The order, which was affirmed on appeal, had the effect of declaring unlawful Goodyear France's efforts to restructure the plant and its workforce. (*Id*. at ¶ 52.) The Works Council filed two additional actions with the French courts. Each action resulted in an order requiring Goodyear and Goodyear France to provide the Works Council with additional information relative to the restructuring. (*Id*. at ¶¶ 55-57.)

Notwithstanding the pronouncements of the French courts, Goodyear France, at Goodyear's direction, continued to decrease its tire production in 2010 and beyond without informing plaintiffs of its intention to restructure, purportedly in violation of French law. On January 31, 2013, Goodyear announced that all production of tires at the Amiens North Factory would eventually cease altogether. (*Id*. at ¶ 66.)

Plaintiffs allege that Goodyear breached the bonus agreement by directing Goodyear France to steadily decrease tire production at the Amiens North Factory. The end result for Wamen and the other workers at the plant was a substantial decrease in

quarterly bonus payments. The revenue decline at the Amiens North Factory caused by the lower production levels also had the effect of reducing the amount of revenue the Works Council received from its representation of the plant employees. (*Id.* at ¶¶ 100-101.)

Plaintiffs brought suit in the Summit County Court of Common Pleas on April 9, 2013. Goodyear removed the action to this Court, and immediately moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6). On June 6, 2013, plaintiffs filed their amended complaint, in which they raised claims for breach of contract, imputed breach of contract, tortious interference with employment agreements, tortious interference with business relations, and fraud. Following the filing of the amended complaint, Goodyear renewed its motion to dismiss, advancing the same arguments it raised in support of its initial dispositive motion.

## II.  STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing authorities). In other words, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 556, n.3 (criticizing the *Twombly* dissent's assertion that the pleading standard of Rule 8 "does not require, or even invite,

5

the pleading of facts"). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

### III. DISCUSSION

#### A. Breach of an Express Contract

In Count I, plaintiffs allege that Goodyear exercised complete control over Goodyear France, such that "Goodyear France had no separate mind, will of its own." (Doc. No. 6 at ¶ 96.) The complete control allowed Goodyear to breach the bonus agreement "by not performing in good faith and artificially organizing the downsizing of the production of the Amiens North Factory in order to deprive [p]laintiffs of part of their compensation and justify the shutdown of the Amiens North Factory." (*Id.* at ¶ 99.) Goodyear maintains that this claim suffers from numerous deficiencies, not the least of which is that it fails to allege an actual breach of the relevant agreement.

Under Ohio law, to prevail on a breach of contract claim, a plaintiff must establish that: (1) a contract existed; (2) the plaintiff fulfilled his contractual obligations; (3) the defendant failed to meet his duties; and (4) damages resulted. *Doe v. SexSearch.com*, 551 F.3d 412, 416 (6th Cir. 2008) (citing *Lawrence v. Lorain Cnty. Cmty. Coll.*, 127 Ohio App. 3d 546, 713 N.E.2d 478, 480 (Ohio Ct. App. 1998)). A complaint that fails to point to a specific contract provision that has been breached falls short of setting forth a breach of contract claim. *See Northampton Rest. Group, Inc. v.*

*FirstMerit Bank, N.A.*, 492 F. App'x 518, 522 (6th Cir. 2012) ("it is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached") (internal citations omitted).

As Goodyear correctly observes, the amended complaint does not point to any provision of the bonus agreement that was breached. The agreement, itself, does not guarantee any particular level of production, nor does it prohibit the downsizing of production. In fact, the agreement does not even ensure that the plant will remain open for any period of time. Plaintiffs acknowledge this shortcoming, but suggest that Goodyear breached the implied duty of good faith when it secretly negotiated the redistribution of its tire manufacturing business in Europe.

"Parties to a contract are bound toward one another by standards of good faith and fair dealing." *Pappas v. Ippolito*, 177 Ohio App. 3d 625, 642, 895 N.E.2d 610 (Ohio Ct. App. 2008) (internal quotation and citation omitted); *see Cheers Sports Bar & Grill v. DIRECTV, Inc.*, 563 F. Supp. 2d 812, 818 (N.D. Ohio 2008) ("Contracts impose upon the parties a duty of good faith and fair dealing, such that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.") (internal quotation and citation omitted); *O'Brien v. Ravenswood Apartments, Ltd.*, 169 Ohio App. 3d 233, 243-44, 862 N.E.2d 549 (Ohio Ct. App. 2006) ("The duty of good faith and fair dealing, implied in every Ohio contract, requires honesty and reasonableness in the enforcement of a contract."); *Littlejohn v. Parrish*, 163 Ohio App. 3d 456, 839 N.E.2d 49, 54 (Ohio Ct. App. 2005) ("public policy

dictates that every contract contain an implied duty for the parties to act in good faith and to deal fairly with each other").

"'Good faith is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of the drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons v. Francis*, 75 Ohio St. 3d 433, 443-44, 662 N.E.2d 1074 (1996). It requires "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Littlejohn*, 163 Ohio App. 3d at 463 (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)). The doctrine cannot, however, be used to create new affirmative obligations, nor can it be used to alter the terms for which the parties specifically contracted. *See Scotts Co., Inc. v. Farnam Co. Inc.*, 659 F. Supp. 2d 913, 927 (S.D. Ohio 2009) (quoting *Ed Schory & Sons*, 75 Ohio St. 3d at 443-44); *Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Supp. 2d 695, 712 (M.D. Pa. 2006) ("Longstanding Ohio law holds that there can be no implied covenants in a contract in relation to any matter that is specifically covered by the written terms of the contract itself.") (quotation and citation omitted).

In *Diamond Triumph Auto Glass*, the parties entered into a service agreement whereby defendant agreed to permit plaintiff to participate in its network of companies providing replacement windshield glass to customers involved in car accidents. The court rejected plaintiff's argument that defendant violated the implied duty of good faith when it did not make referrals to plaintiff or provide potential customers with plaintiff's pricing and service information. In so ruling, the court reasoned that the possibility of customer referrals was something that could have been contemplated by the

8

parties at the time they negotiated the contract, but plaintiff chose not to bargain for it. 441 F. Supp. 2d at 713.

Similarly, in *Scotts*, the Scotts Company entered into an agreement to sell a portion of its business to the Farnam Company. As part of the sale, Scotts warranted that the business would achieve certain performance benchmarks. When the sold venture did not realize the promised sales levels, Scotts and two related companies brought suit claiming that Farnam acted in bad faith by "stuffing" the distribution channels with excessive inventory prior to the sale to ensure lower sales. In fact, Scotts accused Farnam of harboring "a secret plan from the outset" to entitle it to take a substantial offset against the purchase price. Highlighting the fact that the warranty was a "major component" of the sale, and the issues relating to the warranty were therefore known to the parties at the time of the contract, the court refused to read additional requirements into the agreement. *Scotts*, 659 F. Supp. 2d at 928 ("If Scotts desired for Farnam to accept minimum, prescribed marketing obligations, Scotts should have bargained for such provisions to be included in the [agreement].")

The Court finds these two decisions instructive. Production levels were front and center in the present agreement as they were the *sole* factor for determining the amount of quarterly bonuses, and the parties certainly could have foreseen that such levels might fluctuate—even substantially—over time. The Works Council, on behalf of the putative class, could have bargained for certain guaranteed levels of production but chose not to do so. "Where [, as here,] a matter is specifically covered by the written terms of a contract, there are no implied promises in relation to that matter." *Board of Trs. of Union Twp. v. Planned Dev. Co. of Ohio*, No. CA2000-06-109, 2000 WL

9

1818540, at *9 (Ohio Ct. App. Dec. 11, 2000). Because plaintiffs can point to no express or implied provisions of the agreement that were violated, their express breach of contract claim fails, and defendant is entitled to the dismissal of this claim.[1]

### B. Tortious Interference with Contractual and Business Relations

In Count III, Wamen, on behalf of the putative class, alleges that Goodyear tortiously interfered with the bonus agreement entered into between Goodyear France and the Works Council, resulting in a loss of wages in the form of bonus payments to Amiens North Factory workers. In Count IV, the Works Council asserts that, by these same actions, Goodyear tortiously interfered with its statutory business relationship with Goodyear France, resulting in a loss of revenues indexed on the wages of the workers at the Amiens North Factory. (Doc. No. 6 at ¶¶ 115, 123.)

Under Ohio law, the "intentional procurement of the contract's breach" is an essential element of a tortious interference with contract claim. *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St. 3d 415, 419, 650 N.E.2d 863 (1995). Because plaintiffs' tortious interference with contract requires the breach of an agreement—something the amended complaint neglects to even allege—it fails for the reasons the breach of express contract falls short.[2]

---

[1] For the same reasons, plaintiffs' imputed breach of contract claim also fails. Count II alleges that Goodyear exercised complete control over Goodyear France, and directed it to downsize production of its consumer tires, in violation of the bonus agreement. (Doc. No. 6 at ¶ 104.) Whether this claim is premised on an undisclosed principal theory or a piercing of the corporate veil theory, the claim is fatally deficient because it fails to point to any provision in the agreement between Goodyear France and the Works Council that *any entity* is alleged to have violated. *See, generally, Doe*, 551 F.3d at 417.

[2] To the extent the Works Council's tortious interference with business relations claim rests on the breach of the bonus agreement, it, too, is subject to dismissal. *See, generally, Harris v. Bornhorst*, 513 F.3d 503, 525 (6th Cir. 2008) ("'The elements of tortious interference with a business relationship are (1) a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom.'") (quoting *McConnell v. Hunt Sports Enters.*, 132 Ohio App. 3d 657, 689, 725 N.E.2d 1193 (Ohio Ct. App. 1999)).

Goodyear posits that both tortious interference claims are subject to dismissal for the additional reason that it was privileged to become involved in the business and contractual relations of its subsidiary. "'[O]ne who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relation with another, or perform a contract with another is liable to the other for the harm caused thereby.'" *Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1127 (6th Cir.), *cert. denied*, 456 U.S. 991, 102 S. Ct. 2272, 73 L. Ed. 2d 1286 (1982) (quoting *Juhasz v. Quik Shops, Inc.*, 55 Ohio App. 2d 51, 379 N.E.2d 235, 238 (Ohio Ct. App. 1977)). It is undisputed, however, that one cannot interfere with one's own business. *Doan v. Glouster*, 173 Ohio App. 3d 617, 630, 879 N.E.2d 838 (2007). Under Ohio law, a parent company is privileged to interfere with its subsidiary's contract because it is considered the same entity as the subsidiary. *See Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.*, 862 F.2d 597, 601 (6th Cir. 1988); *Kirk v. Shaw Envtl., Inc.*, No. 1:09 CV 1405, 2010 WL 1387887, at *8 (N.D. Ohio Mar. 31, 2010) ("[B]ecause the economic interests of the parent company and the subsidiary [are] so closely aligned, the parent cannot be an 'outsider' to the business relationship.") (citing *Servo Kinetics Inc. v. Tokyo Precision Instruments Co. Ltd.*, 475 F.3d 783, 801 (6th Cir. 2007)); *Vitek v. AIG Life Brokerage*, No. 06-cv-615, 2008 WL 4372670, at *10 (S.D. Ohio Sept. 22, 2008).

While not denying a principal's right to interfere with a subsidiary's business and contractual relations, plaintiffs suggest that the right is not absolute, and

direct the Court to the factors set forth in the Restatement (Second) of Torts § 767[3] and relied upon in *Juhasz*, 55 Ohio App. 2d at 57. Because consideration of these factors is a fact-intensive inquiry, plaintiffs suggest that this is not a proper subject for a Rule 12(b)(6) motion. However, *Juhasz* did not involve a parent-subsidiary relationship, and "[t]he privilege enjoyed by a parent company is not dependent on a Section 767 analysis." *ITS Fin., LLC v. Advent Fin. Servs.*, *LLC*, 823 F. Supp. 2d 772, 784 (S.D. Ohio 2011).

Relying on the Sixth Circuit's decision in *Cambio Health Solutions, LLC v. Reardon*, 234 F. App'x 331, 335 (6th Cir. 2007), plaintiffs also argue that a parent corporation's privilege to interfere with its subsidiary's business applies only when the parent owns one-hundred percent (100%) of the subsidiary. However, the decision in *Cambio* was based on Tennessee law, and no such exception exists under Ohio law.[4] *See, e.g., Nephrology & Hypertension Specialists, LLC v. Fresenius Med. Ctr. Holdings, Inc.*, No. 2:09-cv-781, 2010 WL 3069758, at *7 (S.D. Ohio Aug. 5, 2010) (rejecting the requirement in *Cambio* that the privilege be reserved for parents with 100% ownership of the subsidiary, noting that "[t]he Court's review of Ohio case law finds no support in

---

[3] Quoting § 767 of the Restatement (Second) of Torts, the court in *Juhasz* explained that, in determining privilege, a court should look at the following factors: "(a) the nature of the actor's conduct, (b) the nature of the expectancy with which his conduct interferes, (c) the relations between the parties, (d) the interest sought to be advanced by the action and (e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand." *Id*. at 57.

[4] In *Cambio*, the Sixth Circuit certified to the Tennessee Supreme Court the question of whether, under Tennessee Law, "a parent company's qualified privilege to interfere in the contractual relations of a wholly-owned subsidiary appl[ies] when the parent has a majority interest in the subsidiary[.]" *Id*. at 335. Tennessee's high court answered the question in the negative, and the Sixth Circuit relied on this pronouncement in ruling on the viability of the plaintiff's tortious interference claim. *Id*. Therefore, the Sixth Circuit's ruling, in this unreported decision, was strictly contained within the boundaries of Tennessee tort law.

such an exception to the rule of a parent's privilege . . . .") Because plaintiffs have not even alleged that Goodyear's interests are not aligned with those of its subsidiary, Goodyear France, plaintiffs have not stated claims for tortious interference with contractual or business relations. These claims are also dismissed.

        C.     Fraud

The last two claims in the amended complaint sound in fraud. Count V alleges that Goodyear fraudulently misrepresented that the reductions in tire manufacturing at the Amiens North Plant were temporary, resulting in harm to the putative class in the form of decreased wages. (Doc. No. 6 at ¶ 126-27.) Count VI asserts that the Works Council relied on these same misrepresentations to its detriment. (*Id*. at ¶¶ 130, 132.)

"To state a claim of fraud, plaintiff[s] must allege: (a) a representation (b) that is material to the transactions at hand, (c) made falsely, with knowledge of its falsity, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Doe*, 551 F.3d at 417 (citing *Orbit Elecs., Inc. v. Helm Instrument Co*., 167 Ohio App. 3d 301, 855 N.E.2d 91, 100 (Ohio Ct. App. 2006)). Goodyear suggests that plaintiffs' fraud claims are fundamentally deficient because they lack any justifiable reliance. The Court agrees.

On behalf of the putative class, Wamen alleges that the plant employees relied on Goodyear's purported misrepresentations by "accept[ing] the decrease of their wages which resulted from the decrease in the number of tires produced by the Amiens North Factory." (Doc. No. 6 at ¶ 127.) Yet, the determination of their "wages" was

dictated, not by any reaction to defendant's representations, but by a bonus agreement that was entered into almost *10 years before* the alleged misrepresentations were made. The same holds true for the revenues realized (or *not* realized) by the Works Council. Because plaintiffs received the remuneration to which they were entitled under the agreement, and would not have (and could not have) taken any different action following the alleged misrepresentations, logic dictates that there was no justifiable reliance. *See Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 507 (6th Cir. 2003) (where a plaintiff would not have done anything differently, he cannot establish the element of justifiable reliance on the alleged misrepresentation); *Lucas Ford, LLC v. Ford Motor Credit Co.*, No. 3:09CV451, 2011 WL 1831739, at *5 (N.D. Ohio May 12, 2011) (a party cannot be fraudulently induced into complying with the terms of an agreement that was entered into prior to when the misrepresentations were made). These claims also fail as a matter of law.

### IV.  CONCLUSION

For all of the foregoing reasons, Goodyear's renewed motion to dismiss (Doc. No. 9) is granted. Plaintiffs' claims are dismissed, and this case is closed.

**IT IS SO ORDERED**.

Dated: January 15, 2014

                                              **HONORABLE SARA LIOI**
                                              **UNITED STATES DISTRICT JUDGE**